UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL JON DRANICHAK,

                                Debtor/Appellee,                     1:12-CV-1241-GTS

v.                                              Case No. 10-63042

RICHARD G. ROSETTI; and PLAZA 7, LLC,       Chapter 7

                          Plaintiffs/Appellants.
_____

APPEARANCES:                              OF COUNSEL:

HODGSON RUSS LLP                   RICHARD L. WEISZ, ESQ.
  Counsel for Debtor/Appellee
677 Broadway, Suite 301
Albany, NY 12207

McNAMEE, LOCHNER TITUS & WILLIAMS, P.C.    KENNETH L. GELLHAUS, ESQ.
  Counsel for Plaintiffs/Appellants
677 Broadway
Albany, NY 12207-2503

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      The above-captioned action is a bankruptcy appeal from an Order of United States

Bankruptcy Judge Diane Davis dismissing an amended complaint in an adversary proceeding

filed by Richard G. Rosetti and Plaza 7, LLC ("Plaintiffs") seeking to deny Michael J. Dranichak

("Debtor") a discharge in bankruptcy under 11 U.S.C. § 724(a)(4)(A) and (B).  For the reasons

set forth below, Plaintiffs' appeal is denied, and Bankruptcy Judge Diane Davis's decision is

affirmed.

# I.     RELEVANT BACKGROUND

## A.     Debtor's History

Debtor earned an undergraduate degree from St. Lawrence University with a major in economics.  (Dkt. No. 2-3, at 7 [Transcript of Trial Before U.S. Bankr. Judge Davis on Jan. 31, 2012, or "TT."].)  He also completed "some post-graduate work" at Rensselaer Polytechnic Institute.  (TT. at 7.)

After college, Debtor held numerous jobs, many of which were obtained with help from his father.  Debtor's first employment was with Crellin International ("Crellin"), which was partially owned by Debtor's father.  (TT. at 7-8.)  Simultaneously, Debtor was also employed by Colony Athletic Club, a health club.  (TT. at 7.)  Debtor obtained an ownership interest in Colony Athletic Club in 1992.  (TT. at 8.)  Colony Athletic Club struggled as a business, leading Debtor to seek a personal loan from his father for an unspecified amount.  (TT. at 79.)  Colony Athletic Club filed for bankruptcy in 1997.  (TT. at 9, 78.)[1]

In 1997, Debtor's father opened 5672 Main Street, Inc. ("5672 Main Street"), a gym. Debtor's father was the sole shareholder of 5672 Main Street. (TT. at 9.)  Debtor testified that 5672 Main Street was opened because his father had a UCC filing against gym equipment, including tread mills and weights.  (TT. at 79.)  Debtor's father agreed to downsize the business and allow Debtor to run the new gym business.  (TT. at 79.)  In 1997, Debtor was elected President of 5672 Main Street, and served as such until 2005 when 5672 Main Street closed. (TT. at 10-11.)

---

[1]     It appears that, after Colony Athletic Club filed for corporate bankruptcy in 1997, Debtor filed for individual bankruptcy, under Chapter 13, twice (in 1997 and 1998), in proceedings unrelated to the proceeding giving rise to this appeal.  (TT. at 9, 78, 79.)

Soon after 5672 Main Street closed, Arizona Fitness opened in the same location as 5672 Main Street.  (TT. at 13.)  Again, Debtor's father was the owner of Arizona Fitness.  (TT. at 12.)  Debtor was employed as the "president, general manager, janitor, salesperson."  (TT. at 12.)  Debtor continued in this employment until 2007 when Arizona Fitness was closed.  (TT. at 11-12.)  Throughout his employment with 5672 Main Street and Arizona Fitness, Debtor personally guaranteed some of the loans to these businesses.  (TT. at 20.)

While working at Arizona Fitness Debtor began contracting to mow lawns, paint houses, and conduct home repairs.  Debtor continued to in the same capacity through the time he filed for bankruptcy.  (TT. at 14.)  Debtor's customers primarily paid him by the tender of checks, which he gave to his wife, Lynda Dranichak ("Lynda"), to deposit into her bank account.  (Dkt. No. 2-7, at ¶ 8 [Joint Stipulation as to Uncontested Facts For Trial In The Above Adversary Proceeding or "Joint Stipulation"]; TT. at 28-32.)  Debtor has not held a bank account since the mid-1990s.  (TT. at 31.)

Debtor obtained a real estate license on June 20, 2008, but did not earn any pre-petition income from that license.  (Joint Stipulation, at ¶ 11.)

**B.**     **Debtor's Bankruptcy Petition**

On July 7, 2010, Debtor filed a Chapter 7 bankruptcy petition by submitting a completed Voluntary Petition, Schedules, Declaration Concerning Debtor's Schedule, Statement of Financial Affairs ("SOFA"), and Form B22A ("Means Test") (collectively "Debtor's Petition").

Debtor's Petition states that he owes $988.529.65 in unsecured business debt.  (Schedule F to Debtor's Petition.)  This includes $115,218.00 to Plaza 7, LLC.  (*Id.*)  Debtor's Petition also states that he owes $300,000.00 to his father, Michael Dranichak, Jr.  (*Id.*)

3

Schedule I of Debtor's Petition lists his occupation as a "self-employed" "general handyman" for the last three years.  It lists Debtor's monthly gross income as $2,300.00. Schedule I lists Debtors' spouse, Lynda, as a "homemaker" with monthly gross income of $533.00.

Question 1 of the SOFA directed Debtor to "[s]tate the gross amount of income the debtor received . . . from the beginning of this calendar year to the date this case was commenced."  Debtor did not include any calculation for 2010.  However, at trial, Debtor stated that he continued to conduct lawn mowing, snow plowing, and home repairs in the first six months of 2010.  (TT. at 58.)  Furthermore, his wife Lynda's bank account records show approximately $39,000 in deposits during the first six months of 2010.  (Joint Stipulation, at ¶ 26.)[2]

Question 1 of the SOFA further directed Debtor to "[s]tate also the gross amounts received two years immediately preceding this calendar year."  Debtor stated that he earned $24,000 in 2008 from lawn mowing, snow plowing and home repairs.  However , Debtor listed $24,389 as his gross income on his 2008 tax return.  (Dkt. No. 10, Attach. 1 [Trial Exhibit 2–2008 Federal Tax Return].)[3]

---

[2]     From the record, it is not clear which of these deposits, if any, came from sources other than Debtor's father.  (*See* Dkt. No. 10.)

[3]     The parties stipulate that the sum total of deposits into Debtor's wife Lynda's bank accounts for calendar year 2008 exceeded $24,000.  (Joint Stipulation, at ¶ 24.)  Plaintiffs argue that the total deposits into Lynda's account exceeded $36,000.  (Dkt. No. 9, at 9 [attaching page 5 of Plaintiffs' Brief].)  Plaintiffs also argue that this demonstrates that Debtor's income exceeded $36,000.  (*Id.*)

Further responding to Question 1 of the SOFA, Debtors stated that he earned $27,595 in 2009 from lawn mowing, snow plowing and home repairs.  However, Debtor listed $38,607 as his gross income on his 2009 tax return.  (Dkt. No. 10, Attach. 2 [Trial Exhibit 3–2009 Federal Tax Return].)[4]

It is undisputed that Debtor's Petition failed to disclose Debtor's status as a licensed real estate agent.  At trial, Debtor testified that he did not disclose the license because he did not gain any income prior to the Petition.  (TT. at 71.)  However, later at trial, Debtor testified that he may have been listed as a "sub-agent" or "secondary agent" on certain pre-Petition real estate listings.  (TT. at 121.)  Moreover, Debtor admitted that he received income from four *post*-Petition real estate closings.  (TT. at 114.)

### C.    Plaintiffs' Adversary Proceeding

On October 12, 2010, Plaintiffs commenced the underlying adversary proceeding by filing a complaint, claiming Debtor knowingly made false statements on his Petition.  On December 15, 2010, Plaintiffs filed an amended complaint asserting the same claim.  On January 31, 2012, the bankruptcy court held a one-day trial.  At the trial, the only witness was Debtor.  On March 30, 2012, the parties submitted post-trial briefs.  On June 20, 2012, the bankruptcy court issued a 20-page Memorandum-Decision and Order dismissing Plaintiffs' amended complaint.  Generally, in its Memorandum-Decision and Order, the bankruptcy court found that Debtor made "at least one false oath in the form of erroneous gross income figures

---

[4]      The parties stipulate that the sum total of deposits into Debtor's wife Lynda's bank accounts for calendar year 2009 exceeded $28,000.  (Joint Stipulation, at ¶ 25.)  Plaintiffs argue that the total deposits in Lynda's account in 2009 exceeded $59,000.  (Dkt. No. 9, at 9 [attaching page 5 of Plaintiffs' Brief].)  Plaintiffs also argue that this demonstrates that Debtor's income exceeded $59,000.  (*Id.*)

within his Petition."  The bankruptcy court did not individually examine each of Plaintiffs

contentions to determine which constituted false oaths.  However, the bankruptcy court did

expressly examine whether Debtor's statements were made intentionally or with reckless

disregard for the truth, concluding that they were not so made, based on the following three

findings: (1) that Debtor made attempts to disclose information and genuinely believed his

disclosure was consistent with his tax return; (2) that Debtor's Petition did not contain more or

almost more false information and omissions than it does accurate and true information; and (3)

that Debtor did not attempt to shield himself from his statements by disclaiming responsibility

for those statements, but instead demonstrated that he was intimately familiar with his Petition

through "responsive," "direct" and "transparent" testimony.

### D.      Parties' Arguments on Appeal

#### 1.      Plaintiffs' Brief in Chief

On appeal, Plaintiffs argues that the bankruptcy court erred in failing to find that Debtor

fraudulently made one or more false oaths.  Plaintiffs acknowledge that the bankruptcy court

held that Debtor's misstated his 2008 and 2009 income on the his Petition.  Therefore, Plaintiffs'

sole argument is that the bankruptcy court erred in failing to find that Debtor either fraudulently

or recklessly made these statements.  Plaintiffs' argue that fraudulent intent is demonstrated by

the long pattern of false statements and omissions, including the following: (1) Debtor's failure

to disclose his status as a licensed real estate agent; (2) Debtor's understatement of income for

2008, 2009, and 2010; (3) Debtor's failure to disclose his status as an officer and general

manager of 5672 Main Street and Arizona Fitness; (4) Debtor's overstatement of expenses

totaling more than $2,000, and subsequent admission that those expenses were actually paid by

6

his non-filing spouse; (5) Debtor's pattern of signing his checks to his spouse, thereby creating a "self-settled trust," and (6) Debtor's evasive testimony regarding a land transfer from his father in which his name was temporarily placed on the deed in order to obtain a mortgage from JP Morgan Chase.  Moreover, Plaintiffs argue that reckless disregard for the truth is demonstrated by Debtor's admission that he only glanced over his Petition, without reading it.  (Dkt. No. 9, at 25-29 [attaching pages 21 through 25 of Plaintiffs' Brief].)

**2.      Debtor's Response Brief**

In response, Debtor argues that the bankruptcy court's determination of fact was not clear error.  More specifically, Debtor argues that, although there were "some minor discrepancies" in his Petition, there is no credible evidence of fraudulent intent or reckless disregard for the truth. (Dkt. No. 11, at 11 [attaching page 6 of Debtor's Brief].)  Debtor argues that he consistently testified that he did not disclose his realtor license because he did not have any income associated with the license.  (*Id.* at 14 [attaching page 9 of Debtor's Brief].)  In addition, Debtor argues that his understatement of his income was an honest mistake because he relied on his accountant tax computations, emphasizing that he provided all necessary disclosures to his creditors.  (*Id.* at 13 [attaching page 8 of Debtor's Brief].)  Finally, Debtor argues that Plaintiffs mischaracterize his testimony regarding preparation of the Petition, emphasizing that he "scanned" the Petition and was aware of its contents prior to filing.  (*Id.* at 18 [attaching page 13 of Debtor's Brief].)

**3.      Plaintiffs' Reply Brief**

Plaintiffs' reply argues that Debtor mischaracterizes the record below.  For example, Plaintiffs argue that, contrary to Debtor's assertions, the following facts are true: (1) the

bankruptcy court did not address the JP Morgan Chase real estate transaction, where Debtor allegedly co-signed a mortgage after transferring title to his wife; (2) the defunct status of his Debtor's businesses did not excuse omitting his status as an officer, and (3) Debtor never directly denied having acting fraudulently or recklessly.  (Dkt. No. 12, at 7-10 [attaching pages 3 through 6 of Plaintiffs' Reply].)  In addition, Plaintiffs reassert their arguments that Debtor merely "glanced over" his Petition and improperly omitted a "self-settled trust" with his wife.  (*Id.* at 12-18 [attaching pages 8 through 14 of Plaintiffs' Reply].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard of Review

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a).  Rule 8013 of the Federal Rules of Bankruptcy Procedure provides in pertinent part as follows:

> [o]n an appeal, the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree, or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.

Fed. R. Bankr. P. 8013.  Thus, the district court must uphold the factual findings of a bankruptcy court unless they are clearly erroneous.  *Hudson v. Harris*, 09-CV-1417, 2011 WL 867024, at *9 (N.D.N.Y. Mar. 10, 2011) (Scullin, J.).  A district court may find a bankruptcy court's determination to be clearly erroneous when, on consideration of the record as a whole, the court is left with the definite and firm conviction that a mistake has been committed.  *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) (quoting *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364 [1948]).  "[P]articularly strong deference [must be given to] a [bankruptcy] court's findings of fact based on credibility assessments of witnesses it has heard testify."  *Pisculli v. T.S.*

*Haulers, Inc. (In re Pisculli)*, 426 B.R. 52, 59 (E.D.N.Y. 2010), *aff'd*, 408 F. App'x 477 (2d Cir. 2011) (quoting *In re Boyer*, 328 F. App'x 711, 716 [2d Cir. 2009]).  Although the bankruptcy court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden.  *H & C Dev. Group, Inc. v. Miner (In re Miner)*, 229 B.R. 561, 565 (B.A.P. 2d Cir. 1999) (citation omitted).

The bankruptcy court's legal conclusions, however, are subject to de novo review.  *See Asbestosis Claimants v. U.S. Lines Reorganization Trust (In re U.S. Lines, Inc.)*, 318 F.3d 432, 435 (2d Cir. 2003).  The court reviews mixed questions of law and fact either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual.  *Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings, Inc.)*, 415 B.R. 77, 83 (S.D.N.Y. 2009) (quoting *Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.)*, 554 F.3d 300, 316 n. 11 [2d Cir. 2009]).

## B.      Standard for Denial of Discharge

Generally, denial of a discharge is an extreme penalty.  *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996).  In determining the denial of discharge, the law carries a presumption in favor of the debtor.  *Cadlerock Joint Venture II, L.P. v, Salinardi (In re Salinardi)*, 304 B.R. 54, 58 (Bankr. D. Conn. 2004).  Objections must be strictly construed against the objecting party and liberally construed in favor of the debtor.  *Chalasani*, 92 F.3d at 1310.

A debtor may be denied discharge if he has "knowingly and fraudulently . . . made a false oath or account" in connection with a bankruptcy case.  11 U.S.C. § 727(a)(4)(A).  To prevail on

a claim under § 727(a)(4)(A), plaintiff must prove, by a preponderance of the evidence, that the (1) Debtor made a statement under oath, (2) such statement was false, (3) Debtor knew the statement was false, (4) Debtor made the statement with the intent to defraud creditors, and (5) the statement related materially to the bankruptcy case.  *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 618 (Bankr. N.D.N.Y. 2010) (citing *Calucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y. 2000) (citing *In re Dubrowsky*, 244 B.R. 560, 572 [E.D.N.Y. 2000]); *see also* Fed. R. Bankr. P. 4005.  The existence of the first and fifth elements are not at issue in this case.[5]

Alternatively, a debtor may be denied discharge if he has "knowingly and fraudulently . . . presented or used a false claim" in connection with a bankruptcy case.  11 U.S.C. § 727(a)(4)(B). Section 727(a)(4)(B) is sparsely used.  *Henderson*, 423 B.R. at 619 (citing *Hendon v. Oody (In re Oody)*, 249 B.R. 482, 487 [Bankr. E.D. Tenn. 2000]).  The few courts that have considered objections to discharge for presenting a false claim have required plaintiffs to prove that the debtor represented or used an inflated or fictitious claim.  *Henderson*, 423 B.R. at 619.  Such cases generally involve the scheduling of non-existent debts, the scheduling of inflated debts, or the filing by the debtor of a false proof of claim.  *Id.*  In order to be actionable, a Section 727(a)(4) violation requires both intentionality and materiality.  *Id.* (citing *In re Natale*, 136 B.R. at 349).

---

[5]      It is well established that a debtor's petition and annexed schedules constitute a statement under oath for purposes of § 727(a)(4)(A).  *See e.g. Desiderio v. Parikh (In re Parikh)*, 456 B.R. 4, 28 (Bankr. E.D.N.Y. 2011); *Katz v. Kurtaj (In re Kurtaj)*, 284 B.R. 528, 529-30 (Bankr. D. Conn. 2002); *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994).  Moreover, statements regarding the existence and disposition of a debtor's income are material to the bankruptcy proceeding.  *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 745 (Bankr. N.D. Ill. 2004).

III.    **ANALYSIS**

   A.    **Whether Debtor Has "Knowingly and Fraudulently . . . Made a False Oath or Account" in Connection with a Bankruptcy Case, Pursuant to 11 U.S.C. § 727(a)(4)(A)**

As indicated above in Parts I.D.1. and I.D.3. of this Decision and Order, generally, Plaintiffs assert two arguments regarding whether Debtor has "knowingly and fraudulently . . . made a false oath or account" in connection with a bankruptcy case.  First, Plaintiffs argue that the bankruptcy court overlooked additional materially false statements which constitute a pattern of false statements and omissions demonstrating a fraudulent intent to deceive.  Second, Plaintiffs argue that the bankruptcy court erred in determining that Debtor did not act with reckless disregard for the truth when he only glanced or scanned his Petition without reading it.

   1.    **Whether Debtor Made Materially False Statements**

Whether the debtor made a false oath within the meaning of Section 727(a)(4)(A) is a question of fact reviewed under the clearly erroneous standard.  *Painwebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 437-38 (S.D.N.Y. 1996).  Thus, the Court reviews the bankruptcy courts determination that Debtor made "at least one false oath in the form of erroneous gross income figures within his Petition" for clear error.

The basis of the bankruptcy court decision on this issue was a careful comparison of the SOFA to Debtor's tax returns.  Ultimately, the bankruptcy court concluded that Debtor erroneously stated his "net income," rather than his "gross income," on the SOFA.  In particular, on the SOFA, Debtor stated that his gross income for 2008 was $24,000, and that his gross income for 2009 was $27,595.  However, Debtor's tax returns show that, in 2008, he had gross receipts of $30,423, business expenses of $6,034, gross income of $24,389, and net income of

11

$24,389. (Dkt. No. 10, Attach. 1, at 10 [attaching page 7 of Trial Exhibit 2–2008 Federal Tax Return].)  In addition, Debtor's tax returns show that, in 2009, he had gross receipts of $48,776, business expenses of $10,169, gross income of $38,607, and net income of $27,595.  (Dkt. No. 10, Attach. 2, at 5 [attaching Trial Exhibit 3–2009 Federal Tax Return].)  As a result, the SOFA under-reported Debtor's gross income for 2008 by $389, and for 2009 by $11,012.[6]

For these reasons, the Court finds that the bankruptcy court properly concluded that this was a materially false statement.  (Dkt. No. 2, Attach. 3, at 14 [Memorandum-Decision and Order].)

### 2.      Whether Debtor Acted with Fraudulent Intent

The requirement that false oaths have been made "fraudulently" may be satisfied in one of two ways.  *Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003).  First, fraudulent intent may be established by circumstantial evidence, or by inference drawn from a course of conduct. *Dean*, 299 B.R. at 140.  Second, "reckless indifference to the truth" constitutes the functional equivalent of fraudulent intent.  *Dubrowsky v. Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 576 (E.D.N.Y. 2000) (citing *In re Casado*, 187 B.R. 446, 450 [Bankr. E.D.N.Y.1995]).  Reckless indifference may be used to prove fraud because a debtor is unlikely to admit having made a deliberate misstatement, knowledge of falsity or fraudulent intent.  *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 618 (Bankr. N.D.N.Y. 2010) (Davis, J.) (citing *In re Martin*, 208 B.R. 799, 806 (N.D.N.Y. 1997) (Scullin, J.); *Carlucci & Legum v. Murray (In re Murray)*,

---

[6]      Debtor has also stipulated that he did not specifically list income of $3,405 from TL Metzger & Associates and $3,400 from Amdiraddo, LLC on the SOFA.  (Joint Stipulation, at ¶¶ 31-32.)  However, it is unclear whether this income was included in Debtor's "2009-Self-Employment Lawn Mowing, Snow Plowing & Home Repair" disclosure.  (*See* SOFA, Question 1.)  As a result, the Court does not find this to be a materially false statement or omission.

249 B.R. 223, 228 (E.D.N.Y. 2000).  The existence of fraudulent intent is a question of fact, and the creditor bears a considerable burden in demonstrating such intent.  *Martin v. Key Bank (In re Martin)*, 208 B.R. 799, 806 (N.D.N.Y. 1997) (Scullin, J.) (citing *In re Miller*, 39 F.3d 301, 306 (11th Cir. 1994).

The reckless indifference standard applies when a pattern of conduct evinces an obvious pattern of deceit that flies in the face of the purpose of the Bankruptcy Code.  *In re Gollomp*, 198 B.R. at 438.  Numerous omission may demonstrate such a pattern.  *Id.*  Similarly, "[a] mere 'glance over' merely corroborates the evidence that the debtors recklessly or wilfully made a false oath within the meaning of 727(a)(4)."  *Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003); *Wolf v. McChesney (In re McChesney)*, 2012 Bankr. LEXIS 2253, at *6 (Bankr. D. Md. May 18, 2012) (finding fraudulent intent where debtor grossly understated income and testified that "she did not pay close attention to her bankruptcy papers").

### a.   Whether Debtor Engaged in a Pattern of Conduct Evincing a Fraudulent Intent

As indicated above in Parts I.D.1. and I.D.3. of this Decision and Order, Plaintiffs argue that there are six false or deceiving acts contributing to the existence of a pattern of conduct which evinces fraudulent intent, including the following: (1) Debtor's misstatement of income; (2) Debtor's overstatement of expenses; (3) Debtor's omission of his status as a realtor; (4) Debtor's omission of his status as an officer and general manager of 5672 Main Street and Arizona Fitness; and (5) Debtor's omission of gifts to his spouse; and (6) Debtor's evasive testimony regarding a land transfer from his father in which his name was temporarily placed on the deed in order to obtain a mortgage from JP Morgan Chase.  (Dkt. No. 9, at 22-25 [attaching pages 18 through 21 of Plaintiffs' Brief].)

13

### i.       Misstatement and Concealment of Income

As indicated above in Part III.A.1, the Court agrees with the bankruptcy court that Debtor's misstatement of his 2008 and 2009 income constituted a false oath.  Although the bankruptcy court did not address the issue, this Court finds that Debtor's omission of his 2010 income similarly constituted a false oath.[7]  The Court has considered these facts in determining whether Debtor engaged in a course of conduct to deceive his creditors.  However, the Court has also considered Debtor's trial testimony (the credibility of which was evaluated and accepted by the bankruptcy court) that he believed he was honestly reporting his income as determined by his accountant and reflected on his tax return.  Thus, regarding the misstatement of his 2008 and 2009 income, the Court finds that confusing "net income" with "gross income," as Debtor appears to have done, was merely a neglectful mistake.

The Court similarly agrees with the bankruptcy court's rejection of Plaintiffs' argument that Debtor concealed income.  (*Id.* at 14.)  Plaintiffs argued that an investigation of deposits into the bank account of Debtor's wife Lynda demonstrated that Debtor understated his business income.  However, the bankruptcy court reasoned that, "absent testimony from Lynda, in light of Debtor's testimony that his father financially supported his family and often made cash gifts to Lynda, the Court cannot determine with certainty exactly what deposits were attributable to Debtor's business and, hence, by what amount, if any, his gross income was understated."  (*Id.*)  This Court can identify no error in that analysis.

---

[7]       Question 1 required Debtor "[s]tate the gross amount of income . . . from the beginning of this calender year to the date this case was commenced."  (SOFA, Question 1, at 27.)  Debtor simply did not respond to this question.  However, Debtor admitted that he had income in 2010 prior to filing his Petition.  (TT. at 58.)  Failure to list this income was not a true and correct statement, as demanded by the Schedules.

### ii.    Concealment of Real Estate License

The Court has carefully analyzed Plaintiffs' argument regarding the disclosure of Debtor's real estate licenses, and concludes that this issue does not demonstrate fraudulent or reckless intent. Debtor explained the reasons he did not include his real estate license, namely that he did not earn any income from the sale of real estate. The record contains unrebutted testimony that Debtor did not receive any pre-Petition income from this qualification. (TT. at 71.)[8] In light of this fact, it is unclear where, in the Petition, this qualification should have been disclosed. Furthermore, Plaintiffs have failed to cite a single case, and the Court's independent research has not reveal a single case, requiring disclosure of a realtor license without any relevant income.[9] As a result, the Court finds that this omission is not a materially false statement.

---

[8]    Granted, the Court is troubled by Debtor's testimony that, before the filing of his Petition, he may have been listed as a "sub-agent" or "secondary agent" on real estate listings. (TT. at 121.) The Court is also troubled by the fact that Debtor admits he earned *post*-Petition income from four real estate sales. (TT. at 114.) One is tempted to draw the inference that, while the income was earned before the filing of his Petition, it was not distributed until after the filing of his Petition. However, Plaintiffs have not provided any evidence to support the conclusion that he earned pre-Petition income as a realtor.

[9]    *Cf. Gorman v. McGarrh (In re McGarrh)*, 02-37466WHB, 2003 WL 22871583, at *2-3 (Bankr. W.D. Tenn. Oct. 30, 2003) (denying discharge where debtor, a 'retired' real estate agent, failed to disclose business income from remodeling houses); *Davis v. Fawell (In re Fawell)*, 98 B 01274, 1999 WL 569449 (Bankr. N.D. Ill. July 26, 1999) (denying discharge where debtor failed to disclose that he was a licensed real estate broker, chief operating officer of a corporation, and president of a limited liability company because these were supplemental sources of income).

### iii. Status as Officer and General Manager of 5672 Main Street and Arizona Fitness

The Court similarly rejects Plaintiffs' argument that Debtor's failure to disclose his continued "officer/general manager status" regarding 5672 Main and Arizona Fitness evidences fraudulent intent. First, Plaintiffs have provided no evidence that Debtor remained an officer or general manager at the time he filed the Petition. To the extent that Plaintiffs rely on the refund check from National Grid payable to 5672 Main Street in the amount of $4,246.84, that check appears to have been a gift from Debtor's father and does not constitute sufficient evidence that Debtor retained his officer status. (TT. at 67-68; *see also* Joint Stipulation, at ¶ 12.) Second, even assuming that Debtor remained an officer, it is just as likely that Debtor did not disclose the referenced positions because the companies were long-since closed, not because he wanted to deceive the creditors, who were already well acquainted with Debtor's role in these companies.

### iv. Overstatement of Expenses

The Court agrees with the bankruptcy court in rejecting Plaintiffs' arguments regarding Debtor's alleged overstatement of expenses. The bankruptcy court correctly stated that expenses must entail average or projected expenses, not the amounts actually paid. Alternatively, the Court agrees that any alleged overstatement of expenses was not material to this case because any overstatement was not of the magnitude to influence the bankruptcy estate and in no way prejudiced the creditors. *See Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 486 (Bankr. M.D. Fla. 1998) (finding that overstating expenses did not give rise to denial of discharge). For these reasons, the Court finds the alleged overstatement of expenses does not weigh in favor of finding fraudulent intent.

16

v.       **Gifts to Spouse**

The Court is deeply troubled by Debtor's attempts to place his money in his spouses'

bank account.  Question 7 of the SOFA reads as follows: "List all gifts or charitable

contributions made within one year immediately proceeding the commencement of this case

except ordinary and usual gifts to family members aggregating less than $200 in value per

individual family member."  Debtor responded that he had neither received nor made any such

gifs.  However, at trial, Debtor testified as follows:

> Q. When customers tender a check to you for any of these services, what
> is your general procedure for depositing or cashing the checks you
> received?
> A. Everything goes to my wife.
> Q. And when you say that everything goes to your wife could you be a
> little more specific as to what that means?
> A. *The checks come in the mail. I open the mail. I give the checks to my
> wife*.
> Q. Is it fair to say that before you give the checks to your wife that you
> endorse the back of the check with your signature?
> A. I would or at times she would.
> Q. She would endorse your name on the check?
> A. Sometimes.
> Q. Do you have any knowledge of what she would then do with the checks
> that you gave to her?
> A. She would pay our household bills, tremendous amount of credit card
> debt.

(TT. at 30 [emphasis added].)  Thus, it is apparent that, to some extent, Debtor actually did

provide gifts to his spouse in excess of $200, which should have been disclosed on the SOFA.[10]

Moreover, the Court also cannot help but notice the unjustified indignance exhibited by Debtor

---

[10]     Plaintiffs have not claimed a fraudulent transfer under Section 727(a)(2).  Thus,
the Court examines Debtor's alleged transfers to his wife only to the extent that these transfers
constitute the subject matter of a false oath or undermine his credibility.

17

as he answered questions on this subject.[11]

However, the Court relies heavily on the bankruptcy court's determination that Debtor consistently and candidly testified regarding his practice of endorsing checks for his spouse and paying household expenses from his spouse's bank account.  More specifically, Debtor testified that his wife held all their money because he was not good at managing money and would spend too much on whatever business he was involved in.  (TT. at 31.)  Granted, Debtor's testimony on this subject remains disturbing in many respects.[12]  However, without more, this Court cannot find clear error in the bankruptcy court's determination of credibility.  Having had the opportunity to observe Debtor's demeanor and tone of voice, the bankruptcy court was in the best position to make that determination.

---

[11]     For example, the record reads as follows:

> Q.  Okay. But having no legal obligation to do so you turned over all the receipts from your business to your wife to deposit in an account that was solely in her name, correct?
> A.  I would imagine the act of marriage is obligatory–
> MR. GELLHAUS: Your Honor, I would ask the wit–
> THE WITNESS: –as well as feeding my kids would be an obligatory act, so did I have an obligation to do so?  Absolutely. Did I do it of my own free will?  Absolutely.
> Q.  Fair to say that in 1998 then you gave more than $200.00 to Lynda Dranichak?
> A.  Yes, I did.
> Q.  And in 2009 you gave more than $200.00 to Lynda Dranichak?
> A.  Yes, I did.
> (TT. 63.)

[12]     For example, in addition to being disturbed by Debtor's testimony that he knew he would someday go bankrupt (TT. at 60), the Court is disturbed by Debtor's testimony as to his lack of knowledge regarding his family's finances (TT. at 33-35).  It is apparent from the record that Debtor was using his wife Lynda's credit card for not only family expenses, but numerous business expenses for his snow removal, lawn mowing, home repair business.  (TT. at 46.)

18

### vi.      JB Morgan Chase Bank Mortgage

Finally, the Court cannot say that Debtor's testimony as to the JP Morgan Chase Bank

mortgage evidences a fraudulent intent for two reasons.  First, because the transaction occurred

more than one year before Debtor filed his Petition, it did not need to be reported of the SOFA

and is irrelevant to the determination of whether a false oath was made.  Second, the temporal

relationship between the transfer and Debtor's bankruptcy further undermines a finding of

fraudulent intent.  The real estate transaction occurred in 2003, more than two years before 5672

Main Street closed, rendering a connection between the two events speculative at best.  Thus, the

bankruptcy court did not err in holding that there was no obvious pattern of deceit in the instant

case.  *See In re Gollomp*, 198 B.R. at 437 (finding no reckless indifference where debtor

provided explanations for omitting a speedboat, two bank accounts, and $2,217 of income from

his petition).

Thus, after carefully analyzing each and every act alleged by Plaintiffs, the Court cannot

finding any pattern of deceitful acts or course of conduct sufficient to suggest fraudulent intent.

*In re Gollomp*, 198 B.R. at 438.

### b.      Whether Debtor, in Some Other Way, Acted with Reckless Disregard for the Truth

Finally, the Court has carefully examined the issue regarding Debtor's review of the

Petition.  Debtor's Petition and attachments contain a half-dozen verifications as to the truth and

correctness of the information contained therein (implying that he read those documents).

Indeed, the attached Declaration Concerning Debtor's Schedules expressly states, "I declare

under penalty of perjury that I have read the foregoing summary and schedules, consisting of 17

sheets . . . ."  *In re Michael J. Dranichak*, 10-63042-6-dd, Declaration Concerning Debtor's

19

Schedules (Bankr. Ct., N.D.N.Y. filed July 7, 2010).   In addition, the attached SOFA states, "I

declare under penalty of perjury that I have read the answers contained in the foregoing

statement of financial affairs and any attachments thereto . . . . ."   *In re Michael J. Dranichak*,

10-63042-6-dd, Statement of Financial Affairs (Bankr. Ct., N.D.N.Y. filed July 7, 2010).

However, Debtor testified that, before signing that Verification, he merely "glanced" through

and "scanned" his Petition.[13]

The Court find's Debtor's cavalier attitude toward the certification of his Petition (which

appears to be his fourth bankruptcy petition)[14] to be perhaps the most troubling aspect of this

case.  However, the Court is unable to find that Debtor's cursory review of his Petition warrants

the denial of his discharge in bankruptcy.  After carefully reviewing the case law, the Court has

determined that the case law does not require the denial of discharge in this circumstance.  The

Court has found no case holding that the failure to comprehensively review a bankruptcy

---

[13]     Debtor testified in pertinent part as follows:

> Q. Prior to signing this document did you read the document?
> A. I probably glanced through it.
> Q. I'm sorry. I don't understand what you mean by 'glanced through it.'
> A. I'm sure I went over some of the pages with my attorney, but there's a lot of stuff here that quite honestly it wouldn't matter if I read it or not; I wouldn't understand it.

(TT. at 16.)  Debtor later testified as follows:

> Q. But you looked over the document before you signed it, correct?
> A. I scanned it. I have no reason to believe that there was any glowing errors in it.

(TT. at 47.)

[14]     *See, supra, n*ote 1 of this Decision and Order.

20

petition, in and of itself, must lead to denial of discharge.  Instead, in such cases, courts appear to analyze facts such as (1) whether the debtor had knowledge of the contents of the petition independent of his or her review of the petition, (2) the magnitude of the misstatement in or omission from the petition, and (3) the connection between the misstatement or omission and the debtor's failure to review the petition.  *See e.g., In re Bren*, 122 F. App'x 285, 288 (8th Cir. 2005); *In re Mitchell*, 102 F. App'x 860, 863 (5th Cir. 2004); *Silvers v. Alanya (In re Alayna)*, 2010 Bankr. LEXIS 4949, *21 (Bankr. E.D.V.A. 2010).

While the Court acknowledges that this case presents a close question, the Court finds that this case is distinguishable from those cases denying discharge.[15]  Unlike the situations presented in many of the cases cited by Plaintiffs, there is no evidence in this case that Debtor altogether failed to read the Petition.  On this record, it remains uncertain precisely how many pages he "glanced" at or "scanned."  This is because there was no inquiry by Plaintiffs into whether Debtor actually reviewed the few pages containing the errors.

----

[15]       *See, e.g., In re Mitchell*, 102 F. App'x 860, 863 (5th Cir. 2004) (reversing lower courts determination the debtor did not have fraudulent intent because, although mistakes were "honestly made, minor in importance, and relatively few in number," debtor "did not bother going over forms prepared by their attorney to make sure they were accurate"); *In re Bren*, 122 F. App'x 285, 288 (8th Cir. 2005) (reversing and finding fraudulent intent because debtor made numerous false statements, failed to review the petition, and failed to amend the petition); *Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003) (finding debtor's "failure to read her bankruptcy papers constituted a reckless indifference to the truth and the functional equivalent of fraud" where debtor "did not pay close attention to her bankruptcy papers"); *In re Rice*, 452 B.R. 623, 626 (Bankr. E.D. Mich 2011) (finding fraudulent intent where debtor omitted a $100,000 cashiers check and "he did not read all the schedules, but just scanned them"); *Wolf v. McChesney (In re McChesney)*, 2012 Bankr. LEXIS 2253, at *6 (Bankr. D. Md. May 18, 2012) (finding fraudulent intent where debtor grossly understated income and testified that "she did not pay close attention to her bankruptcy papers");  *In re Sims*, 148 B.R. 553, 557 (Bankr. E.D. Ark. 1992) (denying discharge because debtors rapidly removed their names from assets on the eve of bankruptcy, failed to disclose involved family members, and then testified that they merely glanced through their petition).

Moreover, the connection between the misstatements and Debtor's failure to fully read the Petition is tenuous.  For example, because Debtor testified that he obtained his income from his tax return, it is unlikely that a comprehensive review of the Petition would have allowed him to fix this misstatement.  Instead, it is apparent from the record that Debtor provided his attorney with his tax returns (TT. at 17-18) and requesting his attorney run a credit report (TT. at 61).  Under the circumstances, the Court defers to the bankruptcy court's finding that–despite his limited review of the Petition–Debtor was "intimately familiar with the contents of the Petition." (Dkt. No. 2-3, at 17 [Memorandum-Decision Order].)

For all of these reasons, the Court finds that the bankruptcy court did not err in determining that Debtor did not act with reckless disregard for the truth.

**B.      Whether Debtor Has "Knowingly and Fraudulently . . . Presented or Used a False Claim" in Connection with a Bankruptcy Case, Pursuant to 11 U.S.C. § 727(a)(4)(B)**

Plaintiffs did not specifically address this argument in their briefs, leaving it unclear what part of the schedule is asserted to be a fictitious claim.  To the extent that Plaintiffs argue that the inclusion of $300,000 loan from Debtor's father was fictitious, Plaintiffs have adduced insufficient evidence in support of that argument, instead pointing to only general skepticism of Debtor's business practices.  Moreover, as discussed above, any claim under Section 727(a)(4)(B) is undermined by this Court's earlier finding that Debtor lacked fraudulent intent.  Thus, the bankruptcy court did not err in finding Plaintiffs failed to meet their burden of demonstrating that Debtor knowingly and fraudulently used a false claim.

C.      **Conclusion**

In sum, the Court agrees with the bankruptcy court that Debtor is financially

irresponsible.  Furthermore, the Court finds that Debtor's conduct prior to filing his Petition is so

questionable and extensive as to border on being contemptible.  However, the Court is mindful

of the deference that it must give to the bankruptcy court's finding of Debtor's credibility on the

issue of intent.  In addition, the Court is mindful that Plaintiffs did not do any of the following:

(1) call witnesses at trial other than Debtor to establish that Debtor's testimony was false; (2)

identify which portions of the deposits into his wife Lynda's bank account purportedly

constituted concealed income; (3) adduce evidence that Debtor earned any pre-Petition income

in relation to his real estate license; and (4) assert a claim for fraudulent transfer.  Under the

circumstances, Plaintiffs' appeal must be, and is, denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' appeal is **<u>DENIED</u>**, and the Bankruptcy Court's decision is

**<u>AFFIRMED</u>**.

Dated: May 21, 2013
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

23